FILED

2011 JUN -3  PM 1: 49

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BY_____

1   Mark P. Robinson, Jr., SBN 054426
    Daniel S. Robinson, SBN 244245
2   Karen Barth Menzies, SBN 180234
    Karren Schaeffer, SBN 116189
3   ROBINSON, CALCAGNIE & ROBINSON
    620 Newport Center Drive, Suite 700
4   Newport Beach, California   92660
    Telephone: (949) 720-1288
5   Facsimile:  (949) 720-1292
    mrobinson@rcrlaw.net
6   drobinson@rcrlaw.net
    kbmenzies@rcrlaw.net
7   kschaeffer@rcrlaw.net

8   Attorneys for Plaintiff
    RAVI KAHN
9

10                  UNITED STATES DISTRICT COURT

11                 CENTRAL DISTRICT OF CALIFORNIA

12

13

14   RAVI KAHN, individually,              )   Case No.   **SACV 11-00839 JST (RNBx)**
                                           )
15              Plaintiff,                 )   COMPLAINT FOR:
                                           )   1)   STRICT LIABILITY (FAILURE TO
16        vs.                              )         WARN)
                                           )   2)   STRICT LIABILITY (DESIGN DEFECT);
17   ZIMMER HOLDINGS, INC. and             )   3)   STRICT LIABILITY
     ZIMMER, INC.                          )        (MANUFACTURING DEFECT);
18                                         )   4)   NEGLIGENCE;
                Defendants.                )   5)   BREACH OF IMPLIED WARRANTY;
19                                         )   6)   BREACH OF EXPRESS WARRANTY;
                                           )   7)   NEGLIGENT MISREPRESENTATION;
20                                         )   8)   FRAUDULENT CONCEALMENT;
                                           )   9)   INTENTIONAL
21                                         )        MISREPRESENTATION; AND
                                           )   10)  NEGLIGENT MISREPRESENTATION.
22                                         )
                                           )   DEMAND FOR JURY TRIAL
23                                         )
                                           )
24                                         )
                                           )
25                                         )

26

27

28

                                  1
                            COMPLAINT

Plaintiff RAVI KAHN ("Plaintiff"), individually, alleges on information and belief against Zimmer Holdings, Inc. and Zimmer, Inc. (hereinafter collectively "Zimmer" or "Defendants"), the following:

## INTRODUCTION

1.     This product liability action relates to the design, development, manufacture, testing, marketing, promotion, distribution, and sale of Zimmer's defective hip implant component known as the Durom Acetabular Component (the "Durom Cup").

2.     The Durom Cup was surgically implanted in Plaintiff on December 22, 2006 and required surgical revision on December 20, 2007 because the Durom Cup was defective.  These multiple surgeries have caused Plaintiff to suffer significant injuries, including great pain and agony that restricted Plaintiff's ability to engage in the physical activities he enjoys and has affected his ability to perform his work duties.

3.     Zimmer, founded in 1927, is one of the leading competitors in the U.S. hip and knee replacement market and accounted for seventy percent of the market in 2008.

4.     In 2008, the U.S. hip and knee replacement market was valued at $6.7 billion dollars, with the hip replacement market contributing thirty-eight percent of the market at roughly $2.5 billion dollars.  According to Zimmer's 2008 Annual 10-K Report, Zimmer was number one in global market share for reconstructive hip components.  In the period ending December 2008, Zimmer reported $1,279.5 million in hip component sales. Zimmer's total 2008 sales exceeded $4 billion.

5.     Zimmer designs, develops, manufactures, markets, tests, distributes and sells reconstructive orthopedic implants, including joint, dental and spinal implants, trauma products and related orthopedic surgical products.  Zimmer's related orthopedic surgical products include surgical supplies and instruments designed to aid in orthopedic surgical procedures.  Zimmer also has a limited array of sports medicine products.  Zimmer's primary customers include musculoskeltal surgeons, neurosurgeons, oral surgeons, dentists, hospitals, distributors, healthcare dealers and, in their capacity as agents,

healthcare purchasing organizations or buying groups. These customers range from large multi-national enterprises to independent surgeons.

6. Zimmer's Durom Cup is an orthopedic device used in total hip replacement surgeries. Hip replacement surgery, also known as hip arthroplasty, is a surgical procedure in which the patient's hip joint is resurfaced and replaced with an artificial implant. It is typically used to repair joint/bone damage or to treat arthritis pain in the hip joint area. The hip joint is in essence a large ball-and-socket joint composed of two parts: the head of the thighbone, or femur; and the acetabulum, a cup-shaped bone in the pelvis. Therefore, hip replacement surgery traditionally consists of two tasks: (1) replacing the end of the femur, or thighbone, with an artificial "ball," typically made of metal or stainless steel; and (2) resurfacing the hip socket using a metal shell and plastic liner, into which the ball attached to the femur will fit.

7. During hip replacement surgery, damaged portions of the hip are replaced with smooth, durable artificial surfaces to allow the joint to function properly. The Durom Cup is not cemented or screwed in place during implantation. Instead, it was designed to bond to the patient's hip bone. The outside of the Durom Cup is porous, and has been sprayed with a highly engineered substance that is intended to facilitate the cup's acceptance by the human body. It is purportedly intended that the patient's own bone will grow into the exterior shell of the cup. This bone in-growth into the porous shell is what is intended to hold the cup in place.

8. Rather than functioning in the intended manner, the Durom Cup implant resists bone growth and as a result, instead of adhering to the bone, it comes loose and/or pops free from the hip, which can cause damage to the pelvic bone. This unintended result causes extreme and devastating pain and necessitates revision surgery to remove the failed Durom Cup and replace it with a product that functions properly.

9. The Durom Cup is part of a metal-on-metal hip implant system, which was widely sold as being more durable, especially in young and active patients, like Plaintiff.

/ / /

10.     According to an article published in the New York Times, on Thursday March 4, 2010, entitled "Concern Over Metal-on-Metal Implants," studies in recent years indicate that in some cases the devices can quickly begin to wear, generating high volumes of metallic debris that is absorbed into a patient's body.  That situation can touch off inflammatory reactions that cause pain in the groin, death of tissue in the hip joint and loss of surrounding bone."   In Plaintiff's case, he, like the other patients in the studies, suffered from metal debris causing death to the soft tissue and bone surrounding his hip, further decreasing his chances for a successful recovery from his hip revision surgery.

11.     The suspension of the sales of Zimmer's Durom Cup, announced on July 22, 2008, affects thousands of patients.  The Durom Cup has been implanted in over 12,000 patients in the United States since it was first sold on the U.S. market in 2006.

12.     When introducing the Durom Cup, Zimmer represented that the Durom Cup would provide greater range of motion and less wear on the bearing than traditional hip replacement implant components, thus making it an ideal product for younger, active patients.   Contrary to Zimmer's representations, the Durom Cup is prone to an unprecedented failure rate for hip replacement implant components.

13.     Since Defendants first began selling the Durom Cup in the United States in 2006 through on or about July 22, 2008, the product labeling and product information for the Durom Cup failed to contain adequate information, instructions, and warnings concerning implantation of the product and the risks that the Durom Cup can loosen and separate from the acetabulum (hip socket) in patients.

14.     Despite their knowledge of the serious injuries associated with use of the Durom Cup, Defendants engaged in a marketing and advertising program which, as a whole, by affirmative and material misrepresentations and omissions, falsely and deceptively sought to create the image and impression that the use of the Durom Cup was safe.

15.     At all relevant times, Zimmer knew or should have known that the Durom Cup was not safe for the patients in whom it was implanted, including Plaintiff, because of

4

the unacceptable failure rate, which is approximately 24%, according to one leading hip surgeon.

16.     Notwithstanding the knowledge of predicted failures with the defective Durom Cup, Zimmer continued to sell the Durom Cup for implantation in patients until July 22, 2008, when Zimmer announced a suspension of the sale and distribution of the Durom Cup.

17.     Plaintiff and patients in whom the Durom Cups remain implanted, not only have suffered physical injuries, they also bear an unacceptable increase in the risk of severe pain and disability, with or without a costly and painful revision surgery.  The revision surgery is invasive and painful and is often needed to replace the defective Durom Cup implant, as it was here.

**PARTIES**

**I.     PLAINTIFF**

18.     At all times referenced herein, Plaintiff Ravi Kahn was and is a citizen of Buena Park, California.

19.     Plaintiff Ravi Kahn had a Durom Cup implanted into his right hip on December 22, 2006 at Hoag Hospital in Newport Beach, California.  Since that time, he suffered numerous physical injuries and various physical manifestations of extreme emotional distress.  As a result of his defective Durom cup, Plaintiff required a revision surgery to replace his Durom cup on December 20, 2007.

**II.     DEFENDANTS**

20.     Defendant Zimmer Holdings, Inc. is a Delaware corporation with its principal place of business at 345 East Main Street, Warsaw, Indiana, 46580-2746.  At all relevant times, Zimmer Holdings, Inc. was the publicly traded holding company with wholly owned subsidiaries, that it controlled, which designed, manufactured, marketed, supplied and sold to distributors, physicians, hospitals, patients and medical practitioners certain hip socket devices known as the Durom Cup to be surgically implanted in patients throughout the United States, including in the State of California.

5

21.     Defendant Zimmer, Inc. is a Delaware corporation with its principal place of business at 1800 West Center Street, Warsaw, Indiana, 46581-0708.  At all times relevant, Zimmer, Inc was a wholly owned subsidiary of Defendant Zimmer Holdings, Inc. Defendant Zimmer, Inc. designed, manufactured, marketed, supplied and sold the Durom Cup to physicians, hospitals, and clinics to be surgically implanted in patients in the State of California.

22.     At all relevant times, each of the Defendants and their directors and officers acted within the scope of their authority of each Defendant and on behalf of each other Defendant.  During the relevant times, Defendants possessed a unity of interest between themselves and Zimmer exercised control over its subsidiaries and affiliates.  As such, Defendants are each individually, as well as jointly and severally, liable to Plaintiff for Plaintiff's injuries, losses and damages.

## JURISDICTION AND VENUE

23.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because Plaintiff and Defendants are citizens of different States and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

24.     Venue in this action properly lies in the Central District of California pursuant to 28 U.S.C. §§ 1391 (a) and (c), as a substantial number of the events, actions or omissions giving rise to Plaintiff's claims occurred in this District.  At all times material hereto, Defendants conducted substantial business in the State of California.

25.     Upon information and belief, at all relevant times, Defendants were present and transacted, solicited and conducted business in California, through its employees, agents and/or sales representatives, and derived substantial revenue from such business.

26.     At all relevant times, Defendants placed the defective device that was implanted in Plaintiff into the stream of interstate commerce.

27.     Defendants are conclusively presumed to have been doing business in this state and are subject to California's long arm jurisdiction.

/ / /

28.    At all relevant times, Defendants expected or should have expected that their acts and omissions would have consequences within the United States and the State of California.

29.    Plaintiff' damages in this matter accrued in the Central District of California.

**FACTUAL ALLEGATIONS**

**I.    BACKGROUND ON ARTIFICIAL HIPS AND HIP REPLACEMENT DEVICES**

30.    The human hip joint consists of two parts: a ball and a socket.  A portion of the pelvic bone forms a cup-shaped socket; the ball at the top of the thigh bone fits into it. The ball is surrounded with cartilage which, in a healthy hip joint, allows the ball to move smoothly within the socket.  Conditions such as osteoarthritis and avascular necrosis can cause degeneration of the hip joint such that hip replacement is required.  A hip implant is designed to replicate the human anatomy—that is, the relatively simple ball and socket structure of the human hip joint.  Total hip replacement surgery involves implanting an artificial ball and socket into the patient.

31.    The artificial hip implantation process requires a surgeon to insert a metal cup with a smooth lining into the patient's diseased pelvic socket.  The lining serves the same purpose as natural cartilage: allowing for smooth movement of the ball portion of the thigh bone.  The diseased or degenerated ball part of the thigh bone is then removed and replaced by a metal or sometimes ceramic ball mounted onto a thin metal stem.  The metal stem is then fit into the thigh bone.  Finally, the ball is placed securely into the pelvic socket that has been fitted with the artificial metal cup, where it should move easily, without friction or pain to the patient.

32.    Total hip replacement is most commonly used to treat joint failure caused by osteoarthritis.   Other indications include rheumatoid arthritis, avascular necrosis, traumatic arthritis, protrusion acetabuli, certain hip fractures, benign and malignant bone tumors, arthritis associated with Paget's disease of the bone, ankylosing spondylitis and juvenile rheumatoid arthritis.  The aims of the procedure are pain relief and improvement

1 in hip function.  Hip replacement is usually considered only once other therapies, such as
2 pain medications, have failed.

3     33.   Total hip arthroplasty ("THA"), or total hip replacement, is a common
4 medical procedure performed on more than 420,000 patients in the U.S. each year.  It is
5 designed to help relieve pain and improve joint function in people with severe hip
6 degeneration due to arthritis or trauma.  Traditional devices to replace degenerative hips
7 utilize implantable metal or ceramic heads fitting into a modular metal-backed
8 polyethylene bearing.  One concern that historically plagues successful THAs is the wear
9 of the bearing.  As the THA becomes more common among younger patients who want to
10 maintain a physically active lifestyle, alternative bearing surfaces such as cross-linked
11 polyethylene, ceramic-on-ceramic and metal-on-metal have been developed to address the
12 issue of wear.  The Durom Cup promised to offer an alternative surface that would resist
13 wear and tear.

14     34.   The Durom Cup is a monoblock (constructed of a single piece of material)
15 cup made of cobalt chromium (CoCr) alloy and is designed for use in combination with
16 Zimmer's Metasul Metal-on-Metal Tribological Solution LDH (Large Diameter Heads)
17 for THA.  The design and material of the Durom Cup are key elements to its intended
18 stability, wear resistance, and bone sparing characteristics.  The Durom Cup has a pure
19 titanium plasma-sprayed coating for fixation.  The coating on the Durom Cup sold in the
20 United States has a different structure and is slightly thicker (0.1mm) compared to the
21 same products which were sold for use in patients outside of the United States.

22 **II.**   **HISTORY OF THE DUROM CUP**

23     35.   The Durom Cup was launched in Europe in 2003 for hip resurfacing.  Hip
24 resurfacing requires less bone removal than conventional THA, but necessitates a different
25 surgical technique.  The Durom Cup was made available in Canada and Australia in 2003,
26 India and Korea in 2005, and Argentina in 2006.

27     36.   On or about December 19, 2005, Zimmer submitted a section 510(k)
28 Premarket Notification of Intent (K053536) to the FDA to manufacture and market the

Durom Acetabular Component and the Metasul LDH (Large Diameter Heads) devices to the public. Three months later, on March 19, 2006, the FDA cleared the device for marketing and distribution in the United States.

37.   The 510(k) approval process by the FDA is regarded as a simplified "me too" application process, which does not require extensive review and approval by the FDA. A 510(k) is a premarket submission made to the FDA to demonstrate that the device to be marketed is at least as safe and effective, that is, substantially equivalent, to a legally marketed device that is not subject to premarket approval.   Submitters simply must compare their device to one or more legally marketed devices (devices marketed prior to May 28, 1976) and make and support their substantial equivalency claims. The FDA does not perform 510(k) pre-clearance facility inspections and submitters may market the device immediately after 510(k) clearance is granted.

38.   In this instance, Zimmer submitted a simplified 510(k) application that compared the Durom Cup to earlier products called "predicate devices" manufactured by competitors. In its application, Zimmer described: "The proposed device has the same intended use, has similar performance characteristics, is manufactured from similar materials using similar processes, and is similar in design to the predicate devices."

39.   No clinical studies were conducted in connection with the submission of the application for the Durom Cup. As part of the application process, Defendants stated that the "results of non-clinical analysis demonstrate that the device is safe and effective and substantially equivalent to the predicate device (as implants)." Further in their submission to the FDA the Defendants repeat throughout that the Durom Cup is intended to be a device that is simply similar to previously approved predicate devices. Therefore, the FDA was persuaded by Defendants that any additional review and investigation was unnecessary.

/ / /

/ / /

/ / /

COMPLAINT

III.   **DESIGN & MANUFACTURE OF THE DUROM CUP**

40.   Zimmer's Durom Cup is a flattened hemisphere, which is meant to offer a greater range and freedom of movement.   With a constant wall thickness of 4 mm throughout all sizes, the cup maintains an inner diameter as large as possible, while intended to maintain maximum implant strength and minimum bone resection of acetabular bone mass.  A coating of pure titanium using a plasma spray under vacuum and static load is applied to the outer surface, called Porolock (tm) Ti VPS.  The high carbon cobalt chromium (CoCr) alloy is produced by a forging rather than casting process.  This means that the size of block carbides is up to eight-times smaller compared to cast cobalt chromium (CoCr) prostheses.  The resulting lower surface roughness was intended to lead to a lower wear rate when compared with cast cobalt chromium (CoCr) alloys.

41.   Zimmer failed to recognize the deficiencies of the Durom Cup due to poor and inadequate quality assurance procedures, including failure of Zimmer to implement appropriate physical, manual, x-ray, microscopic and other inspections of the Durom Cup. Zimmer failed to implement or utilize adequate safeguards, tests, inspections, monitoring and quality assessments to ensure safety of the defective device.  At the time the devices were manufactured and sold to patients, the devices were defectively manufactured and unreasonably dangerous, and did not conform to the federal regulations subjecting patients to risks of injury.

42.   During the time Zimmer manufactured the Durom Cup, inadequate manufacturing processes led to material flaws in the quality systems at its manufacturing facilities.

43.   During the course of manufacturing the Durom Cup, Zimmer failed in several ways, including, without limitation, by:

        a.   failing to conduct adequate mechanical testing on components, subassemblies and/or finished Durom Cup;

        b.   failing to test an adequate number of sample devices on an ongoing basis;

10

c.   failing to take adequate steps to specifically identify failure modes with clarity and suggest methods to monitor, avoid, and/or prevent further failures;

d.   failing to identify and/or note the significance of any testing that resulted in failure of the Durom Cup;

e.   failing to take corrective actions to eliminate or minimize further failures of the Durom Cup;

f.   failing to adequately explain performance specifications for the components, subassemblies, and finished Durom Cup;

g.   failing to adequately explain or justify all test conditions and acceptance criteria for the Durom Cup;

h.   failing to perform adequate testing in an environment that adequately simulated in vivo conditions; and, by

i.   failing to perform adequate quality assurance testing before and after sterilization.

44.   Zimmer failed to perform adequate testing of the Durom Cup, including its components and subassemblies, to ensure that the Durom Cup functioned properly during and after implantation.

45.   As a result of these manufacturing and quality control problems associated with the manufacture of the Durom Cup, the component was inadequately and defectively manufactured making it adulterated, and outside of the specifications expressly approved by the FDA.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

11

COMPLAINT

## IV.   LEADING PHYSICIANS SEE A HIGH PERCENTAGE OF FAILURES WITH DUROM CUP

46.   After the FDA initially approved of the 510(k) application, Zimmer began to aggressively market the Durom Cup to physicians.

47.   Relying upon Zimmer's representations, physicians began using broadly the Durom Cup instead of other models.   Reports of Durom Cup failures soon followed.   It is now apparent that a significant percentage of the Durom Cups have failed, and that the failure rate is unacceptably high.

48.   The failure rate is estimated at upwards of 24% (twenty-four percent) when analyzing patients over a four-year period (2006-2010).   This failure rate is much higher than similar products made by Zimmer, and is also much higher than the failure rate of competitor's devices.   Furthermore, this rate is four times Zimmer's predicted failure rate of 5.7%

49.   Since at least 2007, surgeons implanting the Durom Cup complained to Zimmer that the device was failing in their patients, many of whom had to undergo painful, invasive and expensive revision surgeries.

50.   One of these surgeons was Dr. Dorr, a world-renowned orthopedic surgeon and Zimmer consultant, who warned Zimmer in 2007 of the high rate of Durom Cup failures.   At the time Dr. Dorr warned Zimmer of the high rate of failures, he was a veteran of thousands of hip replacement surgeries.

51.   In particular, Dr. Dorr informed Zimmer that x-rays showed that the Durom Cup was failing because it was separating or loosening from the bone, rather than fusing to it, causing patients crippling pain while the metal cup moved around the hip socket and rubbed against the bone.

52.   Zimmer ignored Dr. Dorr's warnings and continued to sell the Durom Cup.

53.   In April 2008, Dr. Dorr warned other orthopedists about the cup failures his patients were experiencing and urged Zimmer to stop selling the Durom Cup.

///

12

54.   On April 22, 2008, Dr. Dorr wrote the following memorandum to his colleagues at the American Association of Hip and Knee Surgeons:

> *MEMO*
>
> *DATE: 4/22/08*
> *TO: American Association of Hip and Knee Surgeons*
> *FROM: Larry Dorr, M.D.*
> *RE: This NOTICE is to inform you that we have had ten revisions in 165 hips and have four more that need to be revised using the Durom cup (Zimmer, Inc).*
>
> *This __failure rate__ has occurred within the first two years. In the first year the x-rays looked perfect. We have revised four that did not have any radiolucent lines or migration (and John Moreland revised one). These early cups fooled us, but the __symptoms were so classic for a loose implant__ that we operated the patients. When we hit on the edge of the cup __it would just pop free__. As time goes by the cups begin developing radiolucent lines. We now have one cup at two years that has actually migrated a short distance. It has tilted into varus. __We do not believe the fixation surface is good on these cups__. Also there is a circular cutting surface on the periphery of the cup that we believe __prevents the cup from fully seating__. __We stopped using the cup after the first revisions__.*
>
> *We have notified Zimmer. __The FDA has been notified__ and we will notify them of our continued revisions. The company does not believe it should pull the cup from the market so I am notifying all of my colleagues of our failure rate with this cup. I went through a similar scenario with the Sulzer cup failures where I was the only one experiencing revisions at the beginning and basically it was assumed that it was our technique. __I can assure you that this goes beyond technique__. I learned my lesson in not informing everyone about __this magnitude of failures__ with the Sulzer cup problem, so it is my obligation to do so with this cup.*

(emphasis in original).

///
///
///

13

55.   After informing colleagues about his experience with the Durom Cup, Dr. Dorr heard from several other doctors who reported similar problems.  According to Dr. Dorr and other physicians, x-rays of patients who received defective Durom Cups showed that the socket was separating from bone, rather than fusing with it.

56.   For patients, including Plaintiff, the slippage of the implant itself, as a result of its failure to adhere to the bone meant agony as the metal cup moved around in the hip socket and rubbed against bone.  As a result, Plaintiff could not walk without assistance. Such crippling injuries are devastating to patients as they were to Plaintiff.

57.   Despite this memorandum, Zimmer again ignored the warnings and continued to sell the Durom Cup.

58.   In late May 2008, Zimmer finally informed surgeons that it was investigating Dr. Dorr's complaint but that it did not suspend sales, as Dr. Dorr had recommended. While Zimmer investigated complaints, roughly 1300 more patients were implanted with the Durom Cup in the United States.

59.   Zimmer responded by defending the Durom Cup and blaming the doctors' implantation techniques.   Zimmer later attributed failures of the Durom Cup to a discrepancy in doctors' techniques in performing THA surgeries.  Zimmer contended (and still contends) that the technology and design parameters of the Durom Cup demand a surgical technique with "high precision and specificity compared to more common and familiar hip arthroplasty surgical techniques practiced in the U.S."  Therefore, according to Zimmer, the Durom Cup requires additional training in implantation technique and cup placement for many surgeons who use the device and who may otherwise may be experts in THA.

60.   Around this time, although Zimmer still maintained that there were no issues with Durom Cup, other doctors began to stop implanting them.   Even still, Zimmer continued to market the Durom Cup to unsuspecting physicians and patients, selling hundreds of units between May 2008 and July 22, 2008.

/ / /

COMPLAINT

61.   Throughout 2008, while the Durom Cup was being implanted in patients across the United States and around the world, Zimmer was accumulating mounting and overwhelming reports that the Durom Cups were failing at an alarming and undisclosed rate.

## V.   TEMPORARY SUSPENSION OF THE DUROM CUP

62.   Zimmer continued to sell the Durom Cups for implantation in patients until July 22, 2008, when Zimmer announced it was temporarily suspending the Durom Cups from marketing and distribution in the United States.  In its announcement, Zimmer stated that the suspension was necessary "while the Company updated labeling to provide more detailed surgical technique instructions to surgeons and implements its surgical training program in the U.S."

63.   Zimmer announced that the company was taking this "voluntary action to address its concerns regarding reports of cup loosening and revisions of the acetabular component used in total hip replacement procedures" but that Zimmer "has found no evidence of a defect in the materials, manufacture, or design of the implant."

## VI.   ZIMMER'S IMPROPER FAILURE TO RECALL DUROM CUP

64.   Under federal regulations, a recall is "a firm's removal or correction of a marketed product that the Food and Drug Administration considers to be in violation of the laws it administers and against which the agency would initiate legal action, e.g., seizure."  A recall is an effective method of removing or correcting consumer products that are in violation of laws administered by the FDA.

65.   These sections also recognize that recall is an alternative to an FDA-initiated court action for removing or correcting violative, distributed products by setting forth specific recall procedures for the Food and Drug Administration to monitor recalls and assess the adequacy of a firm's efforts in recall.  A company's voluntary recall of a medical device and the FDA's classification of that action as a Class I recall establish that the device violates FDA regulations.

/ / /

15

66. In September 2009, a study was published in Clinical Orthopaedics and Related Research, entitled "Failure of the Durom Metasul Acetabular Component." Dr. Dorr and a team of doctors at The Arthritis Institute at Good Samaritan Hospital in Los Angeles, California, compared one hundred and eighty one patients who had the large-diameter (44- to 50-mm) Durom Cup and fifty-four patients who had a small-diameter (28-mm Metasul®) articulation implanted between May 2006 and November 2007. The Durom revision rate within 2 years (mean 1.6 years; range 1-2 years) was 15%, with 72% of those revised having radiographic criteria of loosening. Of the non-revised patients 18% had radiographic impending failure and an additional 8% had clinical failure, while 6% had both. The authors stated that the Defendants "improperly blamed the technique of the surgeon," and that the device should not be used. To date, however, Zimmer has not issued a public recall of the Durom Cup and has continued to describe its remedial action as only a "temporary suspension" of the device.

## VII.   PLAINTIFF'S INJURIES DUE TO THE DEFECTIVE DUROM CUP

67. Plaintiff has been significantly injured due to the implantation of the Durom Cup in his right hip on December 22, 2006. As a result of the Durom Cup's failure, Plaintiff had to adjust his life to accommodate his ongoing injuries.

68. Prior to Plaintiff's December 22, 2006 implantation surgery, Plaintiff was an energetic and active individual, despite being diagnosed with right hip avascular necrosis.

69. In reliance on Zimmer's marketing of the Durom Cup, Plaintiff and his physician expected that this device would provide him with better stability and range of motion than other hip replacement devices on the market. Plaintiff was told that the device was the same type of implant that many professional athletes were given and that he should expect the device would last twenty or more years. Plaintiff expected a significant improvement in his quality of life after the initial hip replacement surgery, which did not occur and continues to impact him physically, financially, and emotionally.

/ / /

/ / /

70.   Plaintiff suffered extensive pain following his 2006 implantation surgery.  He experienced extreme hip, thigh, and groin pain that hindered his ability to perform basic physical motions.  The pain decreased his flexibility and his range of motion, and as a result, it became difficult for him to perform even the simplest tasks.

71.   Plaintiff's injuries due to the defective Durom Cup caused him to struggle at work.  Plaintiff worked as a stylist in Fountain Valley, California and had to reduce his hours to part-time.  Plaintiff continues to be limited in performing any activities that place stress on his hip.

72.   It was not until almost one year after the initial surgery that Plaintiff learned the Durom Cup was loose and that he would need revision surgery, which was performed on December 20, 2007.

## FIRST CAUSE OF ACTION

## STRICT LIABILITY

## (FAILURE TO WARN AND INSTRUCT)

73.   Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

74.   At all relevant times hereto, Defendants were engaged in the development, testing, manufacturing, marketing and sales of the Durom Cup.  Defendants designed, manufactured, assembled and sold the Durom Cup to medical professionals and patients knowing that they would then be implanted in patients in need of hip prosthesis.

75.   Defendants distributed and sold the Durom Cup in the condition in which it left its place of manufacture, in its original form of manufacture, which included the defects described herein.  The Durom Cup was expected to and did reach Plaintiff without substantial change or adjustment in its condition as manufactured and sold by Defendants.

76.   The Durom Cup designed, developed, tested, manufactured, marketed and sold or otherwise placed into the stream of commerce by Defendants was in a dangerous and defective condition and posed a threat to any user or consumer of the Durom Cup. The defect existed in the Durom Cup at the time it was purchased and implanted into

1   Plaintiff.  Plaintiff was and is in a class of persons that Defendants should have considered

2   to be subject to the harm caused by the defective nature of the Durom Cup.

3       77.   The defective Durom Cup was expected and did reach Plaintiff without

4   substantial change in condition.  The Durom Cup was implanted and used in the manner

5   for which it was intended.  This use has resulted in severe physical and emotional and

6   other injuries to Plaintiff due to the defectiveness of the device.

7       78.   Defendants knew or should have known through testing, adverse event

8   reporting, or otherwise, that the Durom Cup created a high risk of bodily injury and

9   serious harm.

10      79.   Defendants failed to provide adequate and timely warnings or instructions

11  regarding the Durom Cup and its known defects.  Defendants failed to advise patients like

12  Plaintiff that monitoring of the cup was necessary to avoid long and painful period, where

13  the device failure would go undetected – as it did here.

14      80.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff

15  has sustained and will continue to sustain severe physical injuries, severe emotional

16  distress, mental anguish, economic losses and other damages.  As a direct result, Plaintiff

17  expended money and will continue to expend money for medical bills and expenses.

18  Plaintiff is entitled to compensatory and equitable damages and declaratory relief in an

19  amount to be proven at trial.

20      81.   In taking the actions and omissions that caused these damages, Defendants

21  were guilty of malice, oppression and fraud, and Plaintiff is therefore entitled to recover

22  punitive damages.

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

COMPLAINT

## SECOND CAUSE OF ACTION

### STRICT LIABILITY

### (DESIGN DEFECT)

82.   Plaintiff incorporates by reference all other paragraphs of the Complaint as if fully set forth herein.

83.   Zimmer is the manufacturer and/or supplier of the Durom Cup and placed this device into the stream of commerce in a defective and unreasonably dangerous condition such that the foreseeable risks exceeded the benefits associated with the design and/or formulation of the Durom Cup.

84.   The Durom Cup manufactured, marketed, distributed and/or supplied by Zimmer was defective in design or formulation in that, when the medical device left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation.

85.   The Durom Cup was expected to and did reach Plaintiff without substantial change in condition.   Alternatively, the Durom Cup manufactured and/or supplied by Defendants was defective in design or formulation, because when the Durom Cup device left the hands of Defendants, the manufacturers and/or suppliers, the Durom Cup was unreasonably dangerous and more dangerous than an ordinary consumer would expect.

86.   The Durom Cup was designed and/or manufactured in a manner violative of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 321 *et seq.*, and the Medical Devices Amendment thereto (hereafter "FDCA").   The facilities or controls used by Defendants in the manufacture, packing, storage, or installation of the Durom Cup were not in conformity with applicable requirements of the FDCA.

87.   The Durom Cup manufactured and/or supplied by Zimmer was defective due to inadequate warnings and/or inadequate trials, testing and study, inadequate exposure of the real risks inherent with the drug as determined by the clinical trials, and inadequate reporting of the results of the clinical trials and post-marketing clinical experiences with the device.

88.    The Durom Cup manufactured and/or supplied by Zimmer was defective due to inadequate post-marketing warnings or instructions because, after Zimmer knew or had reason to know of the risk of injury from the Durom Cup, it failed to provide adequate warnings to the medical community, patients, and the public, including Plaintiff, and continued to promote and advertise the Durom Cup as safe and effective.

89.    The Durom Cup was designed, manufactured, distributed, tested, sold, marketed, and advertised defectively by Zimmer.  As a direct and proximate cause of Zimmer's defective design of the Durom Cup, Plaintiff and other patients had the device implanted in their bodies, and suffered and will continue to suffer increased risk of long-term complications and pain and additional surgeries, personal injuries, the need for corrective surgery, and pain and suffering.

90.    Zimmer was or should have been in possession of evidence demonstrating that the Durom Cup caused serious injuries and would fail.  Nevertheless, Zimmer continued to market the device by providing false and misleading information with regard to the safety and efficacy of the Durom Cup.

91.    Zimmer's actions, as described above, were performed willfully, intentionally and with reckless disregard for the rights of Plaintiff, other patients and the public.

92.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses and other damages.  As a direct result, Plaintiff expended money and will continue to expend money for medical bills and expenses. Plaintiff is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial

93.    In taking the actions and omissions that caused these damages, Defendants were guilty of malice, oppression and fraud, and Plaintiff is therefore entitled to recover punitive damages.

///

COMPLAINT

# THIRD CAUSE OF ACTION

## STRICT LIABILITY

## (MANUFACTURING DEFECT AND FAILURE TO ADHERE

## TO QUALITY CONTROLS)

94.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

95.   The Durom Cup is defectively manufactured because the foreseeable risks of mechanical malfunction and failure outweigh the benefits associated with the Durom Cup.

96.   The Durom Cup was designed and/or manufactured in a manner violative of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 321 *et seq.*, and the Medical Devices Amendment thereto (hereafter "FDCA").   The facilities or controls used by Defendants in the manufacture, packing, storage, or installation of the Durom Cup were not in conformity with applicable requirements of the FDCA.

97.   The Durom Cup was expected to and did reach the Plaintiff without substantial change or adjustment to its mechanical function.

98.   Defendants knew or should have known of the manufacturing defects and the risk of serious bodily injury that exceeded the benefits associated with the Durom Cup.

99.   Furthermore, the Durom Cup and its defects presented an unreasonably dangerous risk beyond what the ordinary consumer would reasonably expect.

100.   The Durom Cup was defective due to inadequate warnings or instruction because Defendants knew or should have known that the Durom Cup created a high risk of bodily injury and serious harm.   Defendants failed to adequately and timely warn consumers of this risk.

101.   The Durom Cup is inherently dangerous for its intended use due to a manufacturing defect or defects and improper functioning.   Defendants are therefore strictly liable to Plaintiff for their breach of duty to Plaintiff.

/ / /

/ / /

COMPLAINT

102.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses and other damages.  As a direct result, Plaintiff expended money and will continue to expend money for medical bills and expenses. Plaintiff is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

103.   In taking the actions and omissions that caused these damages, Defendants were guilty of malice, oppression and fraud, and Plaintiff is therefore entitled to recover punitive damages.

## FOURTH CAUSE OF ACTION

### NEGLIGENCE

104.   Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

105.   At all relevant times, Defendants had a duty and continue to owe a duty to Plaintiff to provide a safely manufactured product, to notify the FDA of flaws, and to warn the FDA and Plaintiff of the defective nature of the Durom Cup.

106.   Defendants breached their duty of reasonable care to Plaintiff by defectively designing, manufacturing, and/or negligently failing to warn of these defects in the Durom Cup, thereby causing Plaintiff's injuries and damages.

107.   Defendants breached their duty of reasonable care to Plaintiff by manufacturing and assembling the Durom Cup in such a manner that it was prone to failures and malfunction and thus exposed Plaintiff to severe and lasting physical trauma and injuries.

108.   Defendants breached their duty of reasonable care to Plaintiff by failing to promptly and adequately notify the FDA and warn and instruct Plaintiff, the medical community, and the public at the earliest possible date of known defects in the Durom Cup.

/ / /

22

109.  Defendants breached their duty of reasonable care to Plaintiff by failing to exercise due care under the circumstances.

110.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses and other damages.  As a direct result, Plaintiff expended money and will continue to expend money for medical bills and expenses. Plaintiff is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

111.  In taking the actions and omissions that caused these damages, Defendants were guilty of malice, oppression and fraud, and Plaintiff is therefore entitled to recover punitive damages.

## FIFTH CAUSE OF ACTION

## BREACH OF IMPLIED WARRANTY

112.  Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

113.  Defendants impliedly warranted that the Durom Cup, which Defendants designed, manufactured, assembled, promoted and sold to Plaintiff and Plaintiff's physician, was merchantable and fit and safe for ordinary use.

114.  Defendants further impliedly warranted that the Durom Cup, which Defendants designed, manufactured, assembled, promoted and sold to Plaintiff and Plaintiff's physician, was fit for the particular purposes for which it was intended and was sold.

115.  Contrary to these implied warranties, the Durom Cup was defective, unmerchantable, and unfit for its ordinary use when sold, and unfit for the particular purpose for which it was sold.

116.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses and other damages.  As a direct result, Plaintiff

1  expended money and will continue to expend money for medical bills and expenses.
2  Plaintiff is entitled to compensatory and equitable damages and declaratory relief in an
3  amount to be proven at trial.

4      117.  In taking the actions and omissions that caused these damages, Defendants
5  were guilty of malice, oppression and fraud, and Plaintiff is therefore entitled to recover
6  punitive damages.

7                          **SIXTH CAUSE OF ACTION**
8                     **BREACH OF EXPRESS WARRANTY**

9      118.  Plaintiff hereby incorporates by reference all preceding paragraphs as if fully
10  set forth herein.

11      119.  Defendants expressly warranted to Plaintiff by and through Defendants
12  and/or their authorized agents or sales representatives, in publications, package inserts, the
13  internet, and other communications intended for physicians, patients, Plaintiff, and the
14  general public, that the Durom Cup was safe, effective, fit and proper for its intended use.

15      120.  In allowing the implantation of the Durom Cup, Plaintiff and Plaintiff's
16  physician relied on the skill, judgment, representations, and express warranties of
17  Defendants.  These warranties and representations were false in that the Durom Cup was
18  not safe and was unfit for the uses for which it was intended.

19      121.  Through sale of the Durom Cup, Defendants are merchants pursuant to
20  Section 2-314 of the Uniform Commercial Code.

21      122.  Defendants breached their warranty of the mechanical soundness of the
22  Durom Cup by continuing sales and marketing campaigns highlighting the safety and
23  efficacy of their product, while they knew of the defects and risk of product failure and
24  resulting patient injuries.

25      123.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff
26  has sustained and will continue to sustain severe physical injuries, severe emotional
27  distress, mental anguish, economic losses and other damages.  As a direct result, Plaintiff
28  expended money and will continue to expend money for medical bills and expenses.

1  Plaintiff is entitled to compensatory and equitable damages and declaratory relief in an

2  amount to be proven at trial.

3      124.   In taking the actions and omissions that caused these damages, Defendants

4  were guilty of malice, oppression and fraud, and Plaintiff is therefore entitled to recover

5  punitive damages.

## SEVENTH CAUSE OF ACTION

## NEGLIGENT MISREPRESENTATION

8      125.   Plaintiff hereby incorporates by reference all preceding paragraphs as if fully

9  set forth herein.

10     126.   At the time Defendants manufactured, designed, marketed, sold and

11  distributed the Durom Cup for use by Plaintiff, Defendants knew or should have known of

12  the use for which the Durom Cup was intended and the serious risks and dangers

13  associated with such use of the Durom Cups.

14     127.   Defendants owed a duty to treating physicians and to the ultimate end-users

15  of the Durom Cup, including Plaintiff, to accurately and truthfully represent the risks of

16  the Durom Cup.   Defendants breached that duty by misrepresenting and/or failing to

17  adequately warn Plaintiff's physicians, the medical community, Plaintiff, and the public

18  about the risks of the Durom Cup, which Defendants knew or in the exercise of diligence

19  should have known.

20     128.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff

21  has sustained and will continue to sustain severe physical injuries, severe emotional

22  distress, mental anguish, economic losses and other damages.   As a direct result, Plaintiff

23  expended money and will continue to expend money for medical bills and expenses.

24  Plaintiff is entitled to compensatory and equitable damages and declaratory relief in an

25  amount to be proven at trial.

26     129.   In taking the actions and omissions that caused these damages, Defendants

27  were guilty of malice, oppression and fraud, and Plaintiff is therefore entitled to recover

28  punitive damages.

## EIGHTH CAUSE OF ACTION

### FRAUDULENT CONCEALMENT

130.   Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

131.   Defendants had a duty to inform Plaintiff of all material facts about the Durom Cup based upon their assumption of that responsibility by representing to consumers that the Durom Cup was a safe and effective hip replacement system.

132.   For years, Defendants have had actual knowledge that the Durom Cup could fail early thereby giving rise to unnecessary pain and suffering, debilitation, and the need for a revision surgery to replace the device with the attendant risks of complications and death from such further surgery.

133.   The fact that the Durom Cup could fail early thereby giving rise to unnecessary pain and suffering, debilitation, and the need for a revision surgery to replace the device with the attendant risks of complications and death from such further surgery was, and is, a material fact.

134.   Defendants failed to disclose this material fact to consumers, including Plaintiff. Instead, Defendants took affirmative steps to prevent physicians and consumers from learning of this material fact, while aggressively marketing the Durom Cup as safe and effective hip replacement systems. This concealment was done with the intent to induce Plaintiff to purchase the Durom Cup so that his physicians could surgically implant the devices into Plaintiff.

135.   In reliance on Defendants' fraudulent concealment of a material fact, Plaintiff purchased the Durom Cup so that his physician could surgically implant the device into Plaintiff.  Had Plaintiff known that the Durom Cup could fail early thereby giving rise to unnecessary physical injury, pain and suffering, debilitation, and the need for a revision surgery to replace the device with the attendant risks of complications and death from such further surgery, he would not have purchased the Durom Cup.

/ / /

26

136.   Plaintiff files this lawsuit within two years of first suspecting that the Durom Cup was defective and a cause of his injuries. Zimmer is estopped from relying on any statutes of limitation because of its fraudulent concealment and misrepresentations of the true facts concerning the dangerously defective condition of the Durom Cup.   Zimmer was, at all times relevant, aware of the nature and existence of the defects in its product, but at all times has continued to manufacture, distribute, and sell its product without revealing the true facts concerning the defects, in order to continue to sell the Durom Cup, and to avoid the recall processes.   The true facts about it's the product continue to be concealed from the public, including Plaintiff.

137. Particularly given Defendants' past and continuing denials of, and concealment of, the existence of any defect Plaintiff could not by the exercise or reasonable diligence, have discovered the wrongful cause of the injuries at an earlier time. When the injuries to Plaintiff were discovered their cause was deliberately hidden and was unknown to Plaintiff. Plaintiff did not know or suspect, nor did Plaintiff have reason to know or suspect, the injury, the cause of the injury, or the tortious nature of the conduct causing injury, until less than two years prior to the filing of this action. Additionally, Plaintiff was prevented from discovering this information sooner because Defendants herein misrepresented to the public, including Plaintiff, that the subject product was not defective and that any injuries, including the Plaintiff's, were caused by misuse and improper placement of the product by his physicians.

138.   More specifically, Plaintiff did not discover the causes of action against these Defendants until late 2009.   Up until that time, Plaintiff had relied upon Defendants' representations that it was his physician's implantation technique, rather than the device itself, that was the cause of his injuries, and that the device did not contain a design or manufacturing defect.   Prior to his revision surgery in December 2007, Plaintiff's doctor shared with him a letter Zimmer sent to the physician's office which made the following representations:

/ / /

27

a.  "The *Durom* Cup was not 'recalled' and Zimmer believes that the device performs well when placed correctly."

b.  "The *Durom* Cup has been available for several years outside the U.S. with excellent clinical results.  The manufacturer has confirmed that there is no evidence of a defect in the design or manufacture of these devices."

c.  "After thoroughly investigating the matter, Zimmer is developing a new training program focused on surgical technique and cup placement, which Zimmer believes will assist surgeons to achieve the desired clinical results with this product.  Zimmer has recommended that all surgeons discontinue use of the product until they have been trained under the new program."

139.   In late 2009, Plaintiff learned of the study published in September 2009 by Clinical Orthopaedics and Related Research, entitled "Failure of the Durom Metasul Acetabular Component."  As described herein, the study compared 207 Durom hips implanted between May 06 and November 07 with a historical control of 54 hips.  The Durom revision rate within 2 years was 15%, with 72% of those revised experiencing loosening.  Of the non-revised patients, 18% had radiographic impending failure and an additional 8% had clinical failure, while 6% had both.  In the "Discussion" section, the authors concluded the following:

> These authors have experienced two cup design failures (Interop® and Durom®) and in both situations, **the company blamed the technique of the surgeon for months before admitting to a product problem.  A national registry would protect surgeons from companies deflecting blame onto the technique.**  We do not recommend use of the Durom® implant.

(emphasis added)

///
///

28

140.   After becoming aware of his injuries, Plaintiff had conducted a reasonable investigation but had no actual or constructive knowledge regarding the cause of the injuries, nor that the injuries had been caused by the defective product. Plaintiff acted with reasonable diligence in discovering the causes of action against these Defendants, and Plaintiff was unable to have made earlier discovery despite such diligence. Plaintiff relied upon misrepresentations by Defendants to him, to the public, the medical community, and to physicians that all material information relating to the nature and extent of known and knowable risks of injury and defects associated with the product had been conveyed by the Defendants to the public and the medical community, when in fact, as set forth above, such information had not been conveyed and was withheld by Defendants. Moreover, Plaintiff was unaware that the Defendants had fraudulently concealed information in their possession regarding the true nature of the risks and defects, and fraudulently concealed facts and information that could have led Plaintiff to discover the causes of action at an earlier time.

141.   As a direct and proximate result of Defendants' fraudulent concealment of the effects of the Durom Cup, Plaintiff has suffered significant damages, including but not limited to physical injury, economic loss, pain and suffering, and the need for further surgery to replace the faulty device, and will continue to suffer such damages in the future.

142.   In taking the actions and omissions that caused these damages, Defendants were guilty of malice, oppression and fraud, and Plaintiff is therefore entitled to recover punitive damages.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

29

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

    A.    Economic and non-economic damages in an amount in excess of $75,000 as provided by law and to be supported by the evidence at trial;

    B.    For compensatory damages according to proof;

    C.    For punitive damages;

    D.    For disgorgement of profits;

    E.    For an award of attorneys' fees and costs;

    F.    For prejudgment interest and the costs of suit; and

    G.    For such other and further relief as this Court may deem just and proper.

Dated: June 3, 2011          ROBINSON CALCAGNIE ROBINSON, INC

By: *Mark P. Robinson, Jr.*
Mark P. Robinson, Jr., CA SBN 054426
Daniel S. Robinson, CA SBN 244245
Karen Barth Menzies, CA SBN 180234
Karren Schaeffer, CA SBN 116189
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive, Suite 700
Newport Beach, California   92660
Telephone: (949) 720-1288
Facsimile:  (949) 720-1292
mrobinson@rcrlaw.net
drobinson@rcrlaw.net
kbmenzies@rcrlaw.net
kschaeffer@rcrlaw.net

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demand a jury trial on all claims so triable in this Complaint

Dated: June 3, 2011

ROBINSON CALCAGNIE ROBINSON, INC

By: *Mark P. Robinson, Jr.*

Mark P. Robinson, Jr., CA SBN 054426
Daniel S. Robinson, CA SBN 244245
Karen Barth Menzies, CA SBN 180234
Karren Schaeffer, CA SBN 116189
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive, Suite 700
Newport Beach, California   92660
Telephone: (949) 720-1288
Facsimile:  (949) 720-1292
mrobinson@rcrlaw.net
drobinson@rcrlaw.net
kbmenzies@rcrlaw.net
kschaeffer@rcrlaw.net

31

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Josephine Tucker and the assigned discovery Magistrate Judge is Robert N. Block.

The case number on all documents filed with the Court should read as follows:

## SACV11- 839 JST (RNBx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

==========================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [X] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |
|---|---|---|

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)          NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

Mark P. Robinson, Jr. SBN 054426
Robinson, Calcagnie & Robinson
620 Newport Center Drive, Seventh Floor
Newport Beach, CA 92660
mrobinson@rcrlaw.net
Tele: 949-720-1288; Fax: 949-720-1292

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAVI KAHN, individually<br><br><br>PLAINTIFF(S)<br><br>v.<br><br>ZIMMER HOLDINGS, INC. and ZIMMER, INC.<br><br><br>DEFENDANT(S). | CASE NUMBER<br><br>**SACV 11-00839 JST (RNBx)**<br><br><br>**SUMMONS** |

TO:   DEFENDANT(S): _____

A lawsuit has been filed against you.

Within 21_____ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☒ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, Mark P. Robinson, Jr._____ , whose address is 620 Newport Center Drive, Seventh Floor, Newport Beach, CA 92660_____ . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated:   JUN - 3 2011   By: _____

NANCY K BOEHME

Deputy Clerk

(Seal of the Court)

1191

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

CV-01A (12/07)                                      **SUMMONS**                                      CCD-1A

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐ )

RAVI KAHN, individually

**DEFENDANTS**

ZIMMER HOLDINGS, INC. and ZIMMER, INC.

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Mark P. Robinson, Jr. SBN 054426
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive, 7th Floor
Newport Beach, CA 92660
mrobinson@rcrlaw.net
949-720-1288; 949-720-1292

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No   ☒ **MONEY DEMANDED IN COMPLAINT: $** Exceeds $75,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Strict Liability (Failure to Warn), Strict Liability (Design Defect), Strict Liability (Manufacturing Defect), Negligence, Breach of Implied Warranty, Breach of Express Warranty, Negligent Misrepresentation, Fraudulent Concealment, Intentional Misrepresentation, and Negligent Misrepresentation

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☒ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | **REAL PROPERTY** | **IMMIGRATION** | | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety/Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS - Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:** Case Number: ___ **SACV 11-00839 JST (RNBx)**

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CV-71 (05/08)                CIVIL COVER SHEET                Page 1 of 2
                                                            CCD-JS44

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? [X] No [ ] Yes

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? [ ] No [X] Yes

If yes, list case number(s): <u>11-cv-04199; USDC New Jersey MDL2158 (Master Docket No. 2:09-cv-04414-SDW-MCA)</u>

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)
- [X] A. Arise from the same or closely related transactions, happenings, or events; or
- [X] B. Call for determination of the same or substantially related or similar questions of law and fact; or
- [X] C. For other reasons would entail substantial duplication of labor if heard by different judges; or
- [ ] D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

[ ] Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

[ ] Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Defendant Zimmer Holdings, Inc. - Indiana |
| | Defendant Zimmer, Inc. - Indiana |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.

Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | |

\* **Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**

Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _Mark P. Robinson, Jr._ Date June 2, 2011

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |